**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-4096**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ROBERT LESLIE STENCIL,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Max O. Cogburn, Jr., District Judge. (3:16-cr-00221-MOC-DCK-1)

Argued: May 7, 2021                                      Decided: June 15, 2021

Before KEENAN, WYNN, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Joseph Bart Gilbert, TARLTON POLK PLLC, Raleigh, North Carolina, for Appellant. Angela Macdonald Miller, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Brian C. Rabbitt, Acting Assistant Attorney General, Robert A. Zink, Acting Deputy Assistant Attorney General, Jeremy R. Sanders, Appellate Counsel, Christopher Fenton, Trial Attorney, Fraud Section, Criminal Division, UNITED STATES DEAPRTMENT OF JUSTICE, Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Robert Leslie Stencil ("Appellant") challenges his conviction and sentence for conspiracy to commit mail and wire fraud, mail and wire fraud, and money laundering. Appellant was indicted for his alleged role in fraudulently running his business, Niyato, an alternative fuel company. He was tried alongside his business partner, Michael Duke.

On appeal, Appellant contends the district court erred by declining to grant his motion to sever his trial from Duke's because the two defendants presented antagonistic defenses. Further, Appellant contends the district court erred in applying the vulnerable victim sentencing enhancement because the district court did not make a specific finding that the fraud scheme involved vulnerable victims.

For the reasons discussed herein, we affirm the district court's denial of Appellant's motion to sever because Appellant and Duke did not present antagonistic defenses. And, we affirm Appellant's sentence because the district court did not err in applying the vulnerable victim enhancement, as Appellant's scheme to defraud targeted people who had already fallen victim to the scheme at least once.

I.

In October 2017, Appellant was indicted in a 38-count indictment, alongside nine codefendants, for various fraud and money laundering crimes. Appellant was charged in 34 counts of the 38 count indictment, including conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Count 1); fourteen counts of mail fraud, in violation of 18 U.S.C. § 1341 (Counts 2–15); fourteen counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 16–29); and, five counts of money laundering, in violation of 18 U.S.C.

2

§ 1957(a) (Counts 30–34).  The crimes involved Appellant's founding and operation of an alternative fuel company called Niyato.  The Government alleged that Appellant, alongside his codefendants, used false and misleading statements to induce his victims to invest in Niyato.

A.

Investment Scheme

Appellant founded Niyato in 2012 purportedly to manufacture and sell alternative fuel vehicles.  In an effort to raise capital to start Niyato, Appellant partnered with codefendant Duke.  Appellant was the Chief Executive Officer of Niyato.  Appellant advertised Niyato as a company based out of Charlotte, North Carolina, that manufactured electric vehicles; had a contract with General American Liquified Natural Gas; had patented technology; had contracts to establish fuel stations across the country; and was on the verge of going public, among other things.  In reality, the company did not have an actual headquarters, did not have any contracts to produce vehicles or even the capability to do so, and was not on the verge of going public.

Through his partnership with Duke, Appellant recruited other employees -- many of whom became coconspirators in this case -- to sell stock in Niyato.  Using a sales pitch formulated by Appellant, the salespeople would call potential investors and inform them that Niyato stock could be purchased for $0.50 per share and would be worth between $5 and $8 once the company went public.  For example, the salespeople would tell investors that Niyato going public was "imminent[,] . . . within 90 days," and that they "should hurry up and buy as much as they can at 50 cents because it's going to go to . . . $5.50[] when it

3

goes public." J.A. 1922–23.[1] Despite the fact that the company never went public, the salespeople continued to use this pitch repeatedly for years. On several occasions, the salespeople reached out to victims who had already bought shares to entice them to purchase more.

Niyato's legal counsel advised Appellant that the company must include in its Private Placement Memorandum[2] how it intended to use the money it received from selling stocks, and specifically, that the profits from the stocks were split evenly between the company and the seller. Appellant advertised that 97.1% of the money invested went back to the company, when in reality the salespeople were receiving 50% commission.

B.

Trial

In January 2019, Appellant and Duke went to trial.[3]

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2] A Private Placement Memorandum is a document issued by a company that includes information for potential investors including information about the stock sales, the company's plans, the stock registration, potential risks, general financial information, and how the company intends to use any proceeds.

[3] Appellant and Duke were also tried alongside Appellant's wife, Ludmilla Stencil. She was acquitted of all charges and her involvement is not relevant to this appeal.

1.

Appellant's Defense

At trial, Appellant portrayed himself as a well-meaning, but naïve, businessperson who relied on others to help him launch Niyato. Toward this end, in closing, Appellant's counsel argued, "He dreams big. He's ambitious." J.A. 3625. Counsel further argued,

> [Appellant] had a knack for finding people he thought at the time were going to help him make this company a success. He knew he couldn't do it on his own. He knew that. And that's normal. And he had these people around him. And not one of them kept up their end of the bargain.

*Id.* at 3630. And as it related to his relationship with codefendant Duke, Appellant's counsel argued:

> And just like good salespeople, Mike Duke built a rapport with [Appellant].
>
> . . .
>
> At no point did [Appellant] ever ask him or anyone else to lie or mislead. [Appellant] was hopeful and optimistic, absolutely. This was his company. But at no point did he ask anyone to lie or misrepresent anything.
>
> . . .
>
> Remember, [Appellant] had no prior experience. He was relying on the advice he was given by Mike Duke and his partner because they told him they had expertise in this area and they helped him with those documents. Those were not things [Appellant] did on his own.

*Id.* at 3632–35. Ultimately, the crux of Appellant's defense was that he was an honest, well-intentioned businessman who believed in Niyato but was swindled by Duke into misleading investors to turn a profit on the company.

5

2.

Duke's Defense

For his part, Duke placed the blame on Appellant and argued that he was an unwitting participant in Appellant's fraudulent scheme. *See* J.A. 3661 ("Mike Duke had blind faith in [Appellant].").

Specifically, Duke's counsel argued:

> How many times on -- during his testimony did Mike Duke say, "I believed [Appellant] when he told me that. I believed [Appellant] when he told me that. I believed [Appellant] when he told me that."
> "Did you know at the time that that wasn't true?"
> "No, I did not. I believed [Appellant] when he told me that."
>
> . . .
>
> You all know exactly what's going on here. [Appellant] had no product to sell and he was living off of -- unbeknownst to Mr. Duke, living off the money that Mr. Duke was out there honestly trying to sell.
>
> . . .
>
> I mean, this whole folder is devoted to lies and misrepresentations passed by [Appellant] on to Mike Duke that Mike Duke didn't know about. It's hard for me to believe that on cross examination of Mr. Duke he actually tried to blame it on us. We didn't raise enough money. Well, the more money we raised, the more money [Appellant] spent on himself. Yes, he had 66 trips, including the first one for a first -- I mean, $2,600 for a two-day trip from North Carolina to Dallas and he was eating at Burger King and elsewhere and staying at a La Quinta or something. That leaves about $2,500 left for a plane ticket or a very expensive car ride. Well, . . . [Appellant] took Mike Duke on a ride. Don't let him take you on a ride by the government's evidence here.

J.A. 3669–77.  Plainly, Duke's defense was that he was an unwitting victim of Appellant's scheme.[4]

3.

Motion to Sever

Before trial, Appellant moved pursuant to Rule 404(b) of the Federal Rules of Evidence to exclude evidence of Duke's past fraudulent activity on the grounds that such evidence would prejudice Appellant.  Specifically, Duke had previously sold stock in other companies using a scheme similar to that of the Niyato fraud scheme.  The Government intended to introduce evidence of Duke's past fraud to demonstrate that Duke engaged in the same modus operandi in other stock selling schemes and to rebut the idea that Duke was relying on Appellant in good faith.  Alternatively, Appellant moved to sever his trial from Duke's pursuant to Federal Rule of Criminal Procedure 14.  The district court denied both of Appellant's motions.  But the district court instructed the Government to separate questioning related to Duke's prior acts from questioning about Niyato and gave a limiting instruction with regard to this evidence.  Each time the Government introduced the past fraud evidence against Duke, it complied with this directive.

After the Government rested its case, Appellant renewed his motion to sever, arguing again that the 404(b) evidence against Duke was prejudicial and that Appellant and Duke had antagonistic defenses.  The district court reserved ruling on the motion, and

_____

[4] Appellant never argued that his trial should have been severed from Ludmilla Stencil's, and thus, her defense is not relevant to this appeal.

Appellant renewed the motion again during Duke's case in chief. At that point, the district court denied Appellant's motion. The court held:

> In this case the jury can believe the core of [Appellant]'s defense that he had a legitimate company and everybody goes free. Or they can believe the core of Mr. Duke's defense which is twofold. If everything was legitimate and everything was fine, then he walks free. Or if not, he just believed everything that was said and is released on that.
>
> The fact that the presentation has been done in a manner that one side may be happier with than the other is not a reason for severance. Therefore, following *United States v[.] Lighty*, 616 F.3d at 321, *United States v[.] Chavez*, 894 F.3d 593, . . . the Court is going to once again rule and will continue to rule unless this changes at some point in this proceeding to each of the defense motions requested by their appellate section.

J.A. 2574.

Appellant again renewed his severance motion at the close of all the evidence. The court again denied Appellant's motion, reasoning that if the jury believed Appellant's argument, "everybody walks." J.A. 3582.

The jury found Appellant guilty of all charges submitted to it,[5] and found Duke guilty of three of 13 mail fraud charges, one of 13 wire fraud charges, and one of four money laundering charges. On appeal, Appellant challenges the district court's denial of his motion to sever his trial from Duke.

---

[5] Counts 7, 22, and 32 were dismissed by the district court, and Appellant was found guilty of the remaining counts.

C.

Sentencing

At Appellant's sentencing hearing, the district court applied a two-level vulnerable victim sentencing enhancement to Appellant's United States Sentencing Guidelines ("Guidelines") range. Notably, prior to the application of the vulnerable victim enhancement, the Government argued:

> [T]he enhancement is appropriate for two independent reasons.
> The first is the fact that these were elderly victims and elderly victims are more susceptible based on their circumstances to crimes like this, and especially telemarketing crimes where fraudsters reach into their homes using their telephone, take isolated individuals and try to persuade them to give them money, which in this case they did.
> The second independent basis is the fact that these fraudsters were victimizing and re-victimizing the same people through this process of reloading. There was an entire system set up with [Appellant] at the head. He was effectively a printing press for press releases, giving the salespeople an excuse to reach out again and again and again to victimize people that they were selecting based on the fact that they knew that they had already fallen victim to the fraud. That's a second independent basis.
> The fact that these were supposedly accredited individuals, there is no evidence in this case that there was any effort by anybody, Mr. Duke or otherwise, to actually determine whether or not these people were sophisticated investors. And given the way that they were approaching them and the way they were pitching these ideas, it's abundantly clear that they were not.
> I think we've also -- if you were to look at the testimony of the victims who testified at trial, it's very clear that these individuals could not afford to make these investments, did not understand the nature of the investments. And regardless, sophisticated or not, they were being lied to in every respect.

J.A. 3927–28.

9

In response to Appellant's opposition to the vulnerable victim enhancement, the district court held:

> [T]here was ample evidence to show that these were vulnerable victims. The question in applying this to the defendant is whether there was evidence that he knew or should have known that these were vulnerable victims. And with this reloading scheme that went on, this defendant should have -- if not known, should have known of the vulnerability of these victims. So I'm going to go ahead and add that enhancement on to the sentence.

J.A. 3928–29.

Under the Guidelines, Appellant was assigned a base offense level of seven, and the district court applied a 16 level enhancement because Appellant was responsible for an economic loss of more than $1.5 million; a two level enhancement because the offense involved more than ten victims; a two level enhancement because the offense involved sophisticated means; a four level enhancement because Appellant was an organizer or leader of criminal activity with five or more participants; and, a two level enhancement because the offense involved vulnerable victims. With the enhancements, Appellant's total offense level was 33, and with his criminal history category of I, his advisory sentencing range was 135–168 months' imprisonment. The district court imposed a sentence of 135 months of imprisonment to be followed by two years of supervised release.

On appeal, Appellant challenges the reasonableness of his sentence, arguing the district court improperly applied the vulnerable victim enhancement in calculating his sentencing Guidelines range.

## II.

"We review a district court's denial of a motion to sever for abuse of discretion." *United States v. Zelaya*, 908 F.3d 920, 929 (4th Cir. 2018). We review criminal sentences for reasonableness pursuant to an abuse of discretion standard. *See United States v. Shephard*, 892 F.3d 666, 670 (4th Cir. 2018). "A sentence based on an improperly calculated Guidelines range is procedurally unreasonable. In reviewing whether a sentencing court properly calculated the Guidelines range, we review the court's factual findings for clear error and its legal conclusions de novo." *Id.* (internal citations omitted).

## III.

## A.

## Motion to Sever

"In general, defendants who are indicted together are tried together." *United States v. Zelaya*, 908 F.3d 920, 929 (4th Cir. 2018). This is because "[j]oint trials are more efficient, and 'generally serve the interests of justice by avoiding the . . . inequity of inconsistent verdicts.'" *United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012) (quoting *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)). "Therefore, when an indictment properly has joined two or more defendants under the provisions of Rule 8(b), severance pursuant to Rule 14 is rarely granted." *Id.* Consequently, "[d]efendants must show clear prejudice arising from a joint trial to establish an entitlement to reversal of their convictions." *Zelaya*, 908 F.3d at 929. That is, "severance generally is granted only when 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'"

11

*Dinkins*, 691 F.3d at 368 (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). "Demonstrating prejudice is a high hurdle." *United States v. Young*, 989 F.3d 253, 266 (4th Cir. 2021).

Although a serious risk of prejudice may occur when defendants present conflicting or antagonistic defenses, the presence of antagonistic defenses alone is not enough to require severance. *See United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010). "The antagonistic defenses must involve more than finger pointing." *Id.* (internal quotation marks omitted). "Hostility among defendants, and even a defendant's desire to exculpate himself by inculpating others, do not of themselves qualify as sufficient grounds to require separate trials." *Dinkins*, 691 F.3d at 369. Instead, severance demands "such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other, or that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Id.* (internal quotation marks and alteration omitted). But "any risk of prejudice that may have existed [can be] minimized by measures less drastic than severance, including limiting instructions given by the district court when certain evidence was admitted against one or more, but not all, defendants." *Id.* at 368. And, "a defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial." *United States v. Cannady*, 924 F.3d 94, 103 (4th Cir. 2019) (internal quotation marks omitted).

Here, Appellant argues that the motion to sever should have been granted because he and Duke presented antagonistic defenses. Specifically, Appellant argues, "Trying Duke and [Appellant] together prejudiced [Appellant] in violation of his constitutional

rights, to due process and a fair trial." Appellant's Br. 6. Further, "Duke's antagonistic defense essentially claimed that [Appellant] was the guilty one, and that he unwittingly sold the stock because he believed all the information that he claimed [Appellant] provided to him. Therefore, the jury would have had to disbelieve [Appellant]'s core defense to agree with Duke's." *Id.* at 14.

The Government, on the other hand, argues that Appellant and Duke did not present mutually antagonistic defenses, and in any event, Appellant cannot establish prejudice as a result of the joint trial.

Much of Appellant's argument that he and Duke presented antagonistic defenses that necessitated severance misses the mark. In large part, the defenses were merely a finger pointing exercise between Appellant and Duke. Appellant contends that Duke's defense placed the blame on Appellant and argued that Appellant was lying to and misleading Duke. But this court has been clear that "antagonistic defenses must involve more than finger pointing." *Lighty*, 616 F.3d at 348. While Appellant argued that Duke was at fault, and Duke argued that Appellant was at fault, the contrariness of these two arguments is not enough to require severance. We have been clear that severance is only required where believing the core of one defense requires the jury to disbelieve the core of the other. That is not the case here. The jury could have accepted Duke's defense -- that Duke blindly followed Appellant's lead in conducting business -- without necessarily disbelieving Appellant's defense -- that Appellant was a well-meaning businessman who did not know the ins and outs of selling stock. As the district court noted, if that were the

13

case, "everybody walks." J.A. 3582. Therefore, Appellant's argument that the defenses were antagonistic does not carry the day.

We are similarly unpersuaded that the joint trial prejudiced Appellant. Appellant argues that Duke elicited testimony that was repetitive to the Government's evidence against Appellant. Further, Appellant argues that Duke's questioning of witnesses and the testimony he elicited was damaging to Appellant's case. However, this court has been clear that prejudice is a high bar, and "a defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial." *Cannady*, 924 F.3d at 103. While Appellant argues the joint trial was harmful, he fails to demonstrate how the outcome of the trial would have been different had his severance motion been granted. *See Lighty*, 616 F.3d at 350 (citing favorably *United States v. Ortiz*, 315 F.3d 873, 898–99 (8th Cir. 2002) (concluding that the defendants were not prejudiced by a combined trial because there was "not an appreciable chance that the defendants would not have been convicted had separate trials been granted" (alterations omitted))). Moreover, the district court minimized the risk of prejudice from evidence introduced specifically against Duke by offering limiting instructions during the presentation of evidence of Duke's previous fraud schemes. Accordingly, we cannot conclude that Appellant has demonstrated that he was prejudiced by the district court's denial of his severance motion. Consequently, we affirm the district court's denial of Appellant's motion to sever.

14

B.

Sentence

Appellant argues the district court imposed an unreasonable sentence by including the vulnerable victim enhancement in Appellant's Guidelines calculation. Per the Guidelines, a two-level sentencing enhancement is added "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). A "vulnerable victim" is "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable . . . ; and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.* at cmt. 2. We have held that there is a two-part test to determine whether the vulnerable victim enhancement should apply. *See United States v. Llamas*, 599 F.3d 381, 388 (4th Cir. 2010). "First, a sentencing court must determine that a victim was unusually vulnerable. Second, the court must then assess whether the defendant knew or should have known of such unusual vulnerability." *Id.* (internal citations omitted). "In other words, applying the vulnerable victim adjustment requires a fact-based explanation of why advanced age or some other characteristic made one or more victims unusually vulnerable to the offense conduct, and why the defendant knew or should have known of this unusual vulnerability." *Id.* (internal quotation marks omitted) (holding the district court improperly applied the vulnerable victim enhancement because it held that the defendant "should have known" about the victims' vulnerabilities but did not provide any explanation or basis for its finding).

In *United States v. Shephard*, we considered whether a defendant's involvement in a reloading scheme was sufficient to support the vulnerable victim enhancement. 892 F.3d 666, 670 (4th Cir. 2018). "The practice of 'reloading' involves targeting people who have already fallen victim to the scheme at least once, if not repeatedly." *Id.* In *Shephard*, we noted a plethora of cases from other circuits in which the vulnerable victim enhancement was upheld in reloading schemes. *Id.* at 670–71 (citing *United States v. Lloyd*, 807 F.3d 1128, 1172–73 (9th Cir. 2015); *United States v. Hoffecker*, 530 F.3d 137, 201–02 (3d Cir. 2008); *United States v. Day*, 405 F.3d 1293, 1295–96 (11th Cir. 2005); *United States v. Coe*, 220 F.3d 573, 582 (7th Cir. 2000); *United States v. Brawner*, 173 F.3d 966, 972–73 (6th Cir. 1999); *United States v. O'Neil*, 118 F.3d 65, 75–76 (2d Cir. 1997)). Indeed, we noted that our sister circuits "affirmed applications of the vulnerable victim enhancement based on the simple fact that reloading—the repeated targeting of a victim—constitutes evidence that the defendant knew the victim was particularly vulnerable to the fraud scheme." *Shephard*, 892 F.3d at 671 (internal quotation marks omitted).

Specifically, the telemarketing scheme in *Shephard* involved reloading because experienced telemarketers would "call[] victims who had already fallen for the scheme and tr[y] to get them to make additional payments." 892 F.3d at 672. During sentencing in *Shephard*, the district court relied on the fact that many of the victims sent tens of thousands of additional dollars in the scheme because they were repeatedly targeted by scammers and the fact that the victim impact statements demonstrated that the victims were unusually vulnerable. *See id.* We upheld the sufficiency of the district court's explanation where the district court overruled the defendant's objection to the vulnerable victim enhancement

16

because of the Government's responses to the defendant's objection and based on the "nature of how this fraud activity worked." *Id.* at 669–70. Consequently, this court held that the reloading scheme at issue was sufficient to support the vulnerable victim enhancement. *See id.* at 672.

Notably, in *Shephard*, we declined to hold that a reloading scheme categorically supports the vulnerable victim enhancement. *See* 892 F.3d at 672 n.3. We held:

> We need not (and do not) decide whether the mere practice of reloading (without more) will always justify applying the vulnerable victim enhancement. There may be unique factual scenarios that rebut the strong inference that defendants who reload victims target them because they are unusually vulnerable. But here, the district court's determination to apply the enhancement was entirely appropriate.

*Id.*

Appellant argues that the case at hand is distinguishable from *Shephard* such that the reloading scheme was not enough to support the vulnerable victim enhancement. However, Appellant's only supporting argument is conclusory, claiming, "No investor who testified exhibited of any signs of vulnerability and none had any difficulty communicating with counsel on direct or cross-examination." Appellant's Br. 46. While Appellant generally referenced the testimony of several investors to argue that none were infirm, he fails to identify any "unique factual scenario" that rebuts the "strong inference" that Appellant's reloading scheme targeted individuals who were "unusually vulnerable." *Shephard*, 892 F.3d at 672 n.3. Appellant also argues that the district court did not make

17

sufficient findings to justify the application of the enhancement or for this court to properly review it.

We are not convinced by Appellant's arguments. The crux of the reloading scheme in *Shephard* was the fact that the defendant was contacting people who had already fallen for the scheme in order to exploit more money from people the defendant knew would fall for the scheme. 892 F.3d at 672. In other words, the targeted victims in *Shephard* had already proven themselves vulnerable to the scheme to defraud them. Likewise, Appellant's investment scheme targeted people who had already invested in his company in order to entice them to invest again and again. *See, e.g.*, J.A. 1776 (Q: "So you said that you refer to the special term for victims who bought large amounts of stock was what?" A: "Whales." Q: "And were those the victims that you would try to reload?" A: "Absolutely, they were the biggest investors."). To induce the victims, Appellant created press releases with false information and convinced current investors that it was wise for them to invest even more. *See id.* at 1774 (describing the way Appellant's employees would call investors with new information and tell them they were going to public soon, and they should invest more because the value of the stock was about to rise). These facts are sufficient to justify the "strong inference" that the reloading scheme supports the vulnerable victim enhancement. *Shephard*, 892 F.3d at 672 n.3.

Moreover, we find the district court's explanation of the application of the vulnerable victim enhancement sufficient. In explaining the facts that supported the enhancement, the district court noted, "Well, there was ample evidence to show that these were vulnerable victims," and, "[W]ith this reloading scheme that went on, this defendant

should have -- if not known, should have known of the vulnerability of these victims." J.A. 3928–29.  And prior to the district court's ruling about the application of the vulnerable victim enhancement, the Government provided a lengthy argument about its applicability. Notably, the Government argued:

> [T]hese fraudsters were victimizing and re-victimizing the same people through this process of reloading. There was an entire system set up with [Appellant] at the head. He was effectively a printing press for press releases, giving the salespeople an excuse to reach out again and again and again to victimize people that they were selecting based on the fact that they knew that they had already fallen victim to the fraud.

J.A. 3927–28.

In *Shephard*, we upheld the district court's explanation as sufficient, first, because the Government "fully explained the argument and cited a number of cases," and, second, because "the court said the enhancement was appropriate given 'the nature of how this fraud activity worked,' which further confirms that the court found the practice of reloading sufficient to support the enhancement."  892 F.3d at 672.  The district court's explanation here is analogous.  The Government's argument sufficiently detailed the facts supporting the enhancement, which the district court accepted.  Further, the district court indicated that it found the practice of reloading sufficient to support the enhancement in this case.

Because *Shephard* concludes that analogous facts of reloading support a "strong inference" that the victims were unusually vulnerable, and because Appellant has not rebutted this inference, we hold that the district court's application and explanation of the enhancement are sufficient.  Accordingly, we affirm the district court's sentence.

19

IV.

For the foregoing reasons, the district court's denial of Appellant's motion to sever and its application of the vulnerable victim enhancement are

*AFFIRMED*.