PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

       *Plaintiff-Appellee,*

v.

JUAN LUIS LLAMAS,

       *Defendant-Appellant.*

No. 09-4045

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Frank D. Whitney, District Judge.
(3:05-cr-00400-FDW-4)

Argued: January 26, 2010

Decided: March 17, 2010

Before MOTZ, KING, and AGEE, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Motz and Judge Agee joined.

## COUNSEL

**ARGUED**: Matthew Segal, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant. Ellen Ruth Meltzer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.,

for Appellee. **ON BRIEF**: Claire J. Rauscher, Executive Director, Kevin Tate, Cecilia Oseguera, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Edward R. Ryan, Acting United States Attorney, Charlotte, North Carolina; Lanny A. Breuer, Assistant Attorney General, Criminal Division, Patrick M. Donley, Peter B. Loewenberg, Fraud Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

KING, Circuit Judge:

In late 2007, Juan Luis Llamas was convicted in the Western District of North Carolina for multiple offenses arising from his role in a fraudulent sweepstakes scheme centered in Costa Rica. Llamas was then sentenced to 132 months of imprisonment and ordered to make restitution in a sum exceeding $4.2 million. On appeal, Llamas raises three primary contentions of error. First, he maintains that the district court erred in applying a Sentencing Guidelines adjustment for preying on unusually vulnerable victims. Second, he contends that the court erred in applying an adjustment for his supervisory role in the fraud scheme. Third, Llamas contends that the court erred in calculating the restitution order. As explained below, we affirm in part, vacate in part, and remand.

I.

A.

Llamas's various fraud and money laundering convictions arose from his participation in an elaborate sweepstakes scheme, which operated from approximately 2003 to 2006 out

of San Jose, Costa Rica.[1] The basic fraud scheme operated essentially as follows: Using lists purchased from "list brokers," operators placed telephone calls to persons in the United States, falsely claiming to represent organizations, such as the "Global Sweepstakes Authority" or the "United States Sweepstakes Security Commission," that did not exist. The initial phone calls were placed by operators called "openers," who would advise potential victims that they had won a cash prize. The openers would explain, however, that a winner was required to pay an up-front fee, typically between $1500 and $3000, to assure safe delivery of the prize money from outside the country. If the scheme worked, the victim would wire the fee to the call center through a money-transferring service such as Western Union. After the fee was transferred, another operator at the call center — referred to as a "loader" — would call the victim again, seeking to extract an additional payment. In their efforts to "reload" victims, the loaders would often resort to more devious tricks, asserting that they represented insurance or government agencies and occasionally threatening their victims with prosecution. No prize money was ever paid, of course, and the fraud scheme continued in this manner until the victims were no longer willing to cough up additional funds.[2]

The call center at issue in this appeal was operated by Michael Kearns, one of appellant Llamas's codefendants. Kearns moved to Costa Rica in 2002 and, with the assistance of Joshua Grimes (another codefendant), began operating his call center (the "Kearns Call Center" or "Center") in 2003. In

---

[1]The facts spelled out herein are drawn from the final Presentence Investigation Report adopted by the sentencing court, as well as from other relevant aspects of the record.

[2]Several call centers throughout Costa Rica were engaged in similar schemes, resulting in multiple federal prosecutions. *See, e.g.*, *United States v. Pileggi*, No. 08-4237 (4th Cir. Jan. 20, 2010). The investigators estimated that, at one point, there were more than fifteen call centers operating such schemes in San Jose alone. Llamas and his coconspirators worked at only one of the centers.

November 2003, Kearns hired Charles Cummins — a childhood friend of Llamas — to work at the Center. With Kearns's approval, Cummins invited Llamas to Costa Rica to participate in the fraud scheme. In March 2004, Llamas moved from California to San Jose, Costa Rica, and began working for Kearns at the Center.

When Llamas first arrived in Costa Rica, he played a relatively minor role at the Kearns Call Center, serving as a translator and security guard and earning between 400 and 600 U.S. dollars per week. Although Llamas eventually trained to become an "opener," he was not particularly successful in that endeavor. After just a few months, Kearns reassigned Llamas to other roles in the sweepstakes scheme. By August 2004, Llamas was serving as the Center's "room boss" or "office manager," and his weekly earnings had jumped to approximately $800. As office manager, Llamas passed out "leads" (a victim's name and phone number) to the various operators, maintained a board listing the operators' successful pitches, and provided technical support for the Center's computers and telephones. Llamas was also responsible for personnel matters, including the calculation of employees' weekly earnings and enforcement of Kearns's operational rules at the Center. For example, Grimes testified that Llamas once sent him home because he arrived late for work.

Llamas continued in his role as the Kearns Call Center's office manager until December 2004, when he withdrew from the fraudulent sweepstakes scheme and returned to California. Although Kearns continued to operate the Center after Llamas's departure, the fraud scheme eventually unraveled. In April 2006, an operator from the Center, attempting to "reload" a victim, instead reached the victim's son (who, unfortunately for the Center, was a judicial officer). The federal authorities were promptly notified of the scheme and, on May 16, 2006, Llamas was apprehended in California.

B.

On December 5, 2006, Llamas was one of twelve defendants charged in an eighty-six count superseding indictment returned in the Western District of North Carolina.[3] The indictment charged Llamas with conspiracy to defraud the United States, in contravention of 18 U.S.C. § 371; forty-two counts of wire fraud, in violation of 18 U.S.C. § 1343; conspiracy to commit money laundering, in contravention of 18 U.S.C. § 1956(h); and nineteen counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1). On November 26, 2007, Llamas pleaded guilty straight up, without a plea agreement, to all sixty-three of the offenses lodged against him by the indictment.

On August 29, 2008, following Llamas's guilty pleas, the probation office prepared and submitted his final Presentence Investigation Report (the "PSR"). The PSR estimated that the Kearns Call Center had defrauded approximately five hundred victims of more than $1.1 million between March 2004 and December 2004, the time frame when Llamas worked there. Using the 2007 edition of the Sentencing Guidelines, the PSR recommended a base offense level of 7, with a sixteen-level increase based on a loss exceeding $1 million, *see* USSG § 2B1.1(b)(1)(I), and a six-level increase for an offense involving more than 250 victims, *see id.* § 2B1.1(b)(2)(C). The PSR then added two levels because the conspirators had misrepresented that they were acting on behalf of a government agency, *see id.* § 2B1.1(b)(8), and two more levels because a substantial part of the fraud scheme was committed outside of the United States, *see id.* § 2B1.1(b)(9), resulting in an adjusted offense level of 33.

---

[3]Llamas and his coconspirators were prosecuted in the Western District of North Carolina because Western Union, the money-transferring service they used to facilitate the fraud scheme, processed funds through Charlotte.

The PSR recommended two additional upward adjustments to which Llamas objected at his sentencing hearing. First, it recommended a two-level adjustment, pursuant to Guidelines section 3A1.1(b)(1), because the majority of the fraud scheme's victims were unusually vulnerable (the "vulnerable victim adjustment"). The PSR emphasized that the Kearns Call Center's victims were elderly and that the "[e]vidence indicates that [Llamas] knew, or should have known, that the victims of this scheme were unusually vulnerable due to age, physical or mental condition, or that they were otherwise particularly susceptible to the criminal conduct." J.A. 564.[4] Second, the PSR recommended a three-level adjustment under Guidelines section 3B1.1(b) due to Llamas's managerial or supervisory role in the scheme (the "aggravating role adjustment"). After applying a three-level reduction for acceptance of responsibility, *see* USSG § 3E1.1, the PSR recommended a total offense level of 35 and a criminal history category of II, resulting in an advisory Guidelines range of 188 to 235 months.

On October 29 and December 8, 2008, the district court conducted a two-part sentencing hearing. As pertinent here, Llamas first objected to the PSR's recommendation of the vulnerable victim adjustment. Llamas stressed that the Kearns Call Center identified its potential victims by purchasing names from "list brokers," meaning that it essentially targeted the public at large, rather than any particular vulnerable group. In an effort to show that Llamas's victims were unusually vulnerable, the Government presented the testimony of two of the fraud scheme's victims: (1) Lawrence Story, a seventy-nine-year-old pecan broker, and (2) Tammy Hart, a thirty-nine-year-old nursing assistant. Story testified that he had been taking medication for Alzheimer's disease for four or five years, and Hart testified that, on one occasion when she was contacted by the Center, she had been expecting a

---

[4]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

call from a doctor regarding her daughter's health. Notably, neither witness attested that any of the Center's employees were aware of these facts. For example, Story made clear that he never discussed his medical situation with anyone from the Center. And although Hart explained to the Center's operator that she was expecting a phone call, she never said that the call related to her daughter's medical care.

The sentencing court thereafter found the vulnerable victim adjustment applicable to Llamas. In assessing Story's contact with the Kearns Call Center, the court observed that "age alone might be sufficient, but also the fact that he's on a drug that can only be prescribed because you have some mental condition." J.A. 429. The court then turned to Hart's testimony, emphasizing that she "was vulnerable because she was awaiting a phone call with regard to her daughter's doctor. Vulnerability is not limited only to age. It can be a physical or mental condition such as a stress like Ms. Hart had." *Id.* at 430. The court also recognized that "[n]umerous other victims have testified in this courtroom in one or more of the trials or hearings related to this Costa Rican fraud scam, and many of those victims were vulnerable in one way or the other." *Id.* at 429. The court then found that Llamas "should have known that some of the victims were vulnerable," *id.* at 431, and concluded that application of the vulnerable victim adjustment was warranted.

Turning to the aggravating role adjustment, Llamas and the prosecution disagreed on the nature of his employment at the Kearns Call Center. Llamas conceded that he distributed "leads," collected completed deals, tracked the callers' earnings, and enforced office rules regarding, inter alia, dress code and arrival times. Llamas sought, however, to minimize his role in the fraud scheme, contending that he was merely Kearns's administrative assistant and lacked any authority to make managerial decisions. The court nevertheless determined that the aggravating role adjustment was warranted, explaining that Llamas, "whether you want to call him a man-

ager or not[,] clearly was a supervisor. He clearly was giving instructions and supervising people at that call center." *Id.* at 432–33.

The district court thereafter adopted the PSR in pertinent part.[5] The court calculated Llamas's advisory sentencing range as 151 to 188 months and imposed a below-Guidelines sentence of 132 months. The court also ordered Llamas to pay more than $4.27 million in restitution, finding that, although the Kearns Call Center caused losses totalling only $1.7 million, Llamas was jointly and severally liable for other losses caused by Costa Rican call centers that were carrying out similar sweepstakes schemes. Llamas timely noticed this appeal, and we possess jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## II.

We review a sentence imposed by a district court for reasonableness, applying a deferential abuse of discretion standard. *See Gall v. United States*, 552 U.S. 38, 51 (2007). The first step in our review of a sentence mandates that we "ensure that the district court committed no significant procedural error, such as . . . improperly calculating[ ] the Guidelines range . . . [or] selecting a sentence based on clearly erroneous facts." *Id.* In assessing whether a sentencing court has properly applied the Guidelines, we review factual findings for clear error and legal conclusions de novo. *See United States v. Osborne*, 514 F.3d 377, 387 (4th Cir. 2008). We review a

---

[5]In assessing the PSR, the district court rejected only its recommendation for a sixteen-level enhancement predicated on the Kearns Call Center causing more than $1 million in losses. The court found that Llamas had participated in the fraud scheme only between March and December 2004, during which time the scheme caused approximately $931,326.20 in losses. Accordingly, the court adopted a fourteen-level enhancement, predicated on a loss of between $400,000 and $1 million. *See* USSG § 2B1.1(b)(1)(H).

restitution order for abuse of discretion. *See United States v. Harvey*, 532 F.3d 326, 339 (4th Cir. 2008).

## III.

Llamas presents three primary contentions on appeal. First, he contends that the district court erred in applying the vulnerable victim adjustment, failing to sufficiently explain its finding that Llamas should have known of his victims' unusual vulnerabilities. Although the Government concedes that the court erred in this respect, it nevertheless asks us to rely on other aspects of the record to affirm the court's application of the vulnerable victim adjustment. Second, Llamas maintains that, because he lacked supervisory authority over his coconspirators, the court improperly applied the aggravating role adjustment. Third, Llamas challenges the restitution order, asserting that the court erred in finding him jointly and severally liable for financial losses caused by other Costa Rican fraud schemes. Notably, the Government also concedes that the court erred in calculating the amount of loss underlying the restitution order. We assess these sentencing contentions in turn.[6]

## A.

First, Llamas challenges the district court's application of

---

[6]Llamas also contends on appeal that his 132-month sentence was procedurally unreasonable because the district court failed to consider the 18 U.S.C. § 3553(a) factors, and that it was substantively unreasonable as compared to his codefendants' sentences. As explained below, the court procedurally erred in applying the vulnerable victim adjustment. Accordingly, we need not reach Llamas's alternative sentencing contentions. *See Gall*, 552 U.S. at 49–50 (observing that sentencing court should "consider all of the § 3553(a) factors" only after "correctly calculating the applicable Guidelines range"); *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009) ("If, and only if, we find the sentence procedurally reasonable can we consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." (internal quotation marks omitted)).

the vulnerable victim adjustment under Guidelines section 3A1.1(b)(1), which provides for a two-level increase in a defendant's offense level "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." Section 3A1.1(b)(1) thus creates a two-prong test for assessing the application of the vulnerable victim adjustment. *See United States v. Stella*, 591 F.3d 23, 29 (1st Cir. 2009). First, a sentencing court must determine that a victim was unusually vulnerable. *See* USSG § 3A1.1 cmt. n.2. Second, the court must then assess whether the defendant knew or should have known of such unusual vulnerability. *See id.* (explaining that vulnerable victim adjustment "would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile"). In other words, applying the vulnerable victim adjustment "requires a fact-based explanation of why advanced age or some other characteristic made one or more victims unusually vulnerable to the offense conduct, and why the defendant knew or should have known of this unusual vulnerability." *United States v. Vega-Iturrino*, 565 F.3d 430, 434 (8th Cir. 2009) (internal quotation marks omitted).

At Llamas's sentencing hearing, the district court found that at least two of the Kearns Call Center's victims were unusually vulnerable. In particular, the court discussed the vulnerabilities of victims Lawrence Story and Tammy Hart, who testified at the sentencing hearing. The court emphasized that Story — the elderly pecan broker — was unusually vulnerable due to his age and mental condition. The court found that Hart was unusually vulnerable because, when she was contacted by the Center, she was stressed about her daughter's medical condition. Having found both Story and Hart to be vulnerable victims, the court observed that the vulnerable victim adjustment would apply only if Llamas knew or should have known of their vulnerabilities. Without further explanation or analysis, however, the court then concluded that "the defendant should have known that some of the victims were vulnerable" and applied the two-level adjustment. J.A. 431.

In applying the vulnerable victim adjustment, the district court simply made a generalized finding that Llamas should have known of his victims' vulnerabilities. This finding, however, as the Government concedes on appeal, does not sufficiently support application of the adjustment. Indeed, our precedent stresses the importance of an adequate explanation for such sentencing decisions. In *United States v. Carter*, we held that a sentencing court is obliged to "place on the record an individualized assessment based on the particular facts of the case before it." 564 F.3d 325, 330 (4th Cir. 2009) (internal quotation marks omitted). And, in *United States v. Wilkinson*, we observed that a sentencing court must provide "a sufficient explanation of its rationale" in making factual findings to support its calculation of a defendant's Guidelines range. *See* __ F.3d __, No. 09-4018, slip op. at 17 (4th Cir. Jan. 4, 2010). An adequate explanation of such a rationale not only "allows for meaningful appellate review," it also "promotes the perception of fair sentencing." *Carter*, 564 F.3d at 328 (internal quotation marks and alterations omitted). Thus, in *Wilkinson*, we remanded for resentencing because the sentencing court's findings "did not provide us anything close to a sufficient explanation of its rationale in making its loss finding . . . that would enable us to review such finding under the clearly erroneous standard." *Wilkinson*, slip op. at 17. Because the court had not explained such finding, we were unable to hold that the sentence was procedurally reasonable, and we thus remanded "with instructions that the [sentencing] court explain in detail" its loss finding. *Id.* at 18.

Here, the district court likewise failed to provide a sufficient explanation of its finding that Llamas should have known that his victims were unusually vulnerable. Although the Government used the Story and Hart evidence to support its contention that Llamas and his coconspirators directed their fraud scheme at unusually vulnerable targets, it produced no evidence concerning Llamas's knowledge of the victims' vulnerabilities. Though the court found that Llamas should have known that his victims were unusually vulnerable, it

offered no explanation or basis therefor. More specifically, it did not explain how Llamas should have known that Story suffered from a mental condition, or how Llamas should have known that Hart was stressed about her daughter's medical situation. Such explanations were crucial, because the record suggests that the Kearns Call Center chose its potential victims at random by purchasing lists of names and phone numbers from "list brokers." That those lists may have included individuals with unusual vulnerabilities does not alone support application of the adjustment. Put simply, the conclusory assertion that Llamas "should have known that some of the victims were vulnerable," J.A. 431, does not warrant application of the vulnerable victim adjustment.

Despite conceding error on this point, the Government seeks to salvage the district court's application of the vulnerable victim adjustment by relying on other aspects of the record — which the court did not discuss. For example, the Government maintains that, by attempting to "reload" persons who had already fallen victim to the sweepstakes scheme, Llamas and his coconspirators preyed on individuals they knew to be "particularly susceptible to the criminal conduct," thereby supporting application of the vulnerable victim adjustment. *See* USSG § 3A1.1 cmt. n.2. The court, however, did not adopt such a theory as its rationale for finding that Llamas should have known of the victims' unusual vulnerabilities. And our *Carter* decision explained that "an appellate court may not guess at the district court's rationale, searching the record for statements by the Government or defense counsel or for any other clues that might explain a sentence." 564 F.3d at 329–30; *see also Wilkinson*, slip op. at 18 ("[W]e are prohibited from presuming the sentencing court has silently adopted arguments presented by a party." (internal quotation marks omitted)). In these circumstances, application of the vulnerable victim adjustment cannot be justified simply because there might be some evidence in the record — not addressed by the sentencing court — supporting the proposition that Llamas should have known that his victims were

unusually vulnerable. Thus, we are unable to conclude that the court's application of the vulnerable victim adjustment was procedurally reasonable. *See Wilkinson*, slip op. at 18.

B.

Next, Llamas challenges the district court's application of the aggravating role adjustment. In this regard, the court assigned Llamas a three-level adjustment, pursuant to Guidelines section 3B1.1(b). Such an adjustment is warranted only "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." USSG § 3B1.1(b). A sentencing court's ruling on the aggravating role adjustment "is a factual determination reviewed for clear error." *United States v. Kellam*, 568 F.3d 125, 147–48 (4th Cir. 2009).[7]

In finding that Llamas had a supervisory role in the fraudulent sweepstakes scheme carried out at the Kearns Call Center, the district court relied primarily on the evidence of coconspirator Joshua Grimes, who confirmed that Llamas served as the Center's "office manager." J.A. 364. Reciting Grimes's testimony, the court found that, as office manager, Llamas was responsible for passing out "leads," tracking the operators' earnings, calculating their weekly wages, and col-

---

[7]The Sentencing Commission has identified seven factors for a sentencing court to consider in assessing whether an aggravating role adjustment is warranted:

[(1)] the exercise of decision making authority, [(2)] the nature of participation in the commission of the offense, [(3)] the recruitment of accomplices, [(4)] the claimed right to a larger share of the fruits of the crime, [(5)] the degree of participation in planning or organizing the offense, [(6)] the nature and scope of the illegal activity, and [(7)] the degree of control and authority exercised over others.

USSG § 3B1.1 cmt. n.4.

lecting victims' payments from Western Union. The court thus concluded that Llamas "clearly was a supervisor" and "clearly was giving instructions and supervising people" at the Center, thereby warranting application of the aggravating role adjustment. *Id.* at 432–33.

In *United States v. Cameron*, we recently explained that, in assessing whether a defendant played an aggravating role in the offense of conviction, the key inquiry is whether the defendant's role was that of "an organizer or leader of people," as opposed to that of a manager over the property, assets, or activities of a criminal organization. 573 F.3d 179, 185 (4th Cir. 2009); *see also United States v. Sayles*, 296 F.3d 219, 226 (4th Cir. 2002) (emphasizing that aggravating role adjustment is proper "only . . . if it [was] demonstrated that [the defendant] was an organizer, leader, manager or supervisor of *people*"). Thus, the aggravating role adjustment is appropriate where the evidence demonstrates that the defendant "controlled the activities of other participants" or "exercised management responsibility." *United States v. Bartley*, 230 F.3d 667, 674 (4th Cir. 2000).

The evidence in the sentencing proceedings supports the proposition that Llamas exercised supervisory responsibility over the activities of the Kearns Call Center by controlling its operators. Llamas enforced the Center's rules, and even punished employees who failed to abide thereby. In passing out "leads," Llamas coordinated the operators' activities, determining which of the so-called "openers" and "loaders" were to make contact with which victims. And Llamas was responsible for calculating each employee's earnings, effectively deciding monetary shares of the fraud scheme's proceeds. In sum, the district court did not clearly err in relying on this evidence to find that Llamas was a supervisor of the Center's employees, rendering the three-level adjustment appropriate.

## C.

Finally, Llamas challenges the district court's restitution order of more than $4.2 million, contending that the court

erred in finding him jointly and severally liable for losses caused by other Costa Rican fraud schemes. Importantly, the Government concedes on appeal that the court erred in that respect.

In pertinent part, the Mandatory Victims Restitution Act of 1996 (the "MVRA") directs a sentencing court, when sentencing a defendant convicted of an offense involving, inter alia, fraud or deceit, to order "that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). Because the MVRA focuses on the offense of conviction rather than on relevant conduct, "the focus of [a sentencing] court in applying the MVRA must be on the losses to the victim *caused by the offense*." *United States v. Newsome*, 322 F.3d 328, 341 (4th Cir. 2003) (emphasis added). Thus, in the context of a conspiracy, a restitution award under the MVRA is limited to the losses attributable to the specific conspiracy offenses for which the defendant was convicted. *See id.*

At the sentencing hearing, investigators testified that the Kearns Call Center caused approximately $1.7 million in losses between March 2004 and April 2006. Yet, in applying the MVRA, the district court ordered Llamas to make restitution of more than $4.2 million, concluding that he was jointly and severally liable for losses caused not only by the Center, but also by other Costa Rican call centers utilizing similar sweepstakes schemes. *See* J.A. 468 ("All those that were involved in any call center are subject, under the [MVRA], [to] the same joint and several liability."). Because the restitution order was not limited to losses attributable to the Center, the Government has properly recognized — and conceded — the legal error underlying the restitution order. *See United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007) ("A district court abuses its discretion when it . . . commits an error of law."). Thus, the district court abused its discretion with respect to the restitution order, and we vacate it as well.

## IV.

Pursuant to the foregoing, we affirm in part, vacate in part, and remand for such other and further proceedings as may be appropriate.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*