**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 22-4360**

—————————

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

THUY TIEN LUONG,

Defendant – Appellant.

—————————

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Kenneth D. Bell, District Judge.  (3:20-cr-00079-KDB-DCK-1)

—————————

Argued:  October 24, 2023                          Decided:  January 8, 2025

—————————

Before HEYTENS and BENJAMIN, Circuit Judges, and Elizabeth W. HANES, United States District Judge for the Eastern District of Virginia, sitting by designation.

—————————

Affirmed in part, vacated and remanded with instructions by published opinion.  Judge Benjamin wrote the opinion, in which Judge Heytens and Judge Hanes joined.

—————————

**ARGUED:**  William Robert Terpening, TERPENING LAW, PLLC, Charlotte, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:**  Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

—————————

DEANDREA GIST BENJAMIN, Circuit Judge:

Thuy Tien Luong appeals her conviction of forced labor in violation of 18 U.S.C. § 1589. She used threats and coercion to force the victim to continue working as a nail technician against the victim's will. At sentencing, the district court applied a two-level vulnerable victim enhancement under the United States Sentencing Guidelines (U.S.S.G) § 3A1.1(b)(1) and a four-level permanent scarring enhancement under U.S.S.G. § 2H4.1(b)(1)(A), among other enhancements.

On appeal, Luong argues that the evidence presented by the Government was insufficient to sustain her conviction. She also argues the district court erred in calculating her base-level offense when it incorrectly applied the vulnerable victim and permanent scarring enhancements. We affirm Luong's conviction but vacate and remand her sentence with instructions for resentencing.[1]

I.

The Government named Luong in a one-count Superseding Indictment filed in the Western District of North Carolina in December 2020. The indictment charged Luong with

---

[1] Luong mistakenly refers to the offense level after the vulnerable victim and permanent scarring enhancements as her "base-level offense." But Luong is challenging her *final* offense level. U.S. Sent'g Comm'n, *An Overview of the Federal Sentencing Guidelines* 1, 3, https://www.ussc.gov/sites/default/files/pdf/about/overview/Overview_Federal_Sentencing_Guidelines.pdf [https://perma.cc/6LT4-XLTT] ("base offense level . . . is the starting point for determining the seriousness of a particular offense," whereas "final offense level is determined by taking the base offense level and then adding or subtracting from it any specific offense characteristics and adjustments that apply."). For clarity's sake, we refer to it as her "final offense level."

forced labor in violation of 18 U.S.C. § 1589. It alleged that she obtained the labor or services of the Victim, by means of force, threatened force, serious harm, threats of serious harm, abuse and threatened abuse of law and legal process, and scheme, plan, and pattern of conduct that intended to cause the Victim to believe that if the Victim did not work for Luong, the Victim would suffer serious harm. The offense purportedly began around October 2016 and continued through June 26, 2018. After a five-day trial, a jury returned a guilty verdict against Luong. We relay the relevant evidence presented to the jury during the Government's case-in-chief and Luong's defense.

## A.

The Victim was born in Vietnam in 1968. She came to the United States as an adult in 1999, and she later became a naturalized citizen. Around 2003 or 2004, she moved to North Carolina where she lived rent free at her Aunt Mai's house along with three other family members through the period charged in the indictment. The Victim received a fourth or fifth grade education in Vietnam, and Vietnamese is her native language. She does not speak or write English well, but she obtained an American driver's license and a nail technician certification. She did not complete additional schooling. Luong was born in Vietnam in 1983. [*Id.* at 508.] She came to the United States at thirteen years old with her family and later became a naturalized citizen. She and her family settled in North Carolina, where Luong completed high school and two years of college. Luong is comfortable speaking both Vietnamese and English.

With Aunt Mai's financial support, the Victim opened her own nail salon, Exquisite Nails, around 2007 or 2008. As the owner and operator, the Victim supervised her

3

employees, purchased inventory, and signed paychecks. A few years later, Luong opened a salon called Luxury Nails. A friend introduced the Victim and Luong, and they bonded over their similarities—they talked about "nails and the jobs." Their friendship developed on a personal level; the Victim told Luong "everything," including details about her family, romantic relationships, education, and financial troubles.

In 2015, the Victim sold her salon for $45,000 because she wanted to help her boyfriend pay for his debts. She was afraid to tell Aunt Mai about her boyfriend's debts, so she kept the debts a secret. In the spring of 2015, she asked Luong for a $10,000 loan, explaining that she needed the money to help Aunt Mai. The truth was that she needed the money to help her boyfriend. The loan remained a secret between the Victim and Luong, with Aunt Mai unaware that the Victim used the family name to secure a debt. The Victim agreed to repay the $10,000 within a year, but the agreement did not include any discussion about interest repayment.

To help repay the loan, the Victim started working as a nail technician at Luxury Nails around February 2016. There, Luong was the boss, and she employed three other people, including her own mother. As a nail technician, the Victim provided manicure, pedicure, and acrylic services to customers. By the fall of 2016, the Victim had completely repaid the $10,000 loan. After the debt was repaid, the Victim confessed to Luong that she had borrowed the money to repay her boyfriend's debts, not on behalf of Aunt Mai. The Victim continued working at Luxury Nails where the Victim and Luong maintained their friendship for a time.

4

The relationship soured in 2017 when Luong started to claim that the Victim's work performance was costing the salon money. Luong told the Victim she was making "mistakes" with customers. She forced the Victim to write the mistakes in a notebook. The notebook said that the Victim had ill intentions with clients and gossiped at work. Luong forced the Victim to write her thousands of dollars in checks as payment for the mistakes. She also demanded that the Victim write her a check to repay "interest" on the $10,000 loan that the Victim already satisfied. Luong threatened to tell Aunt Mai embarrassing things about the Victim—that she used Aunt Mai's name to borrow money from Luong and that she was making mistakes at work. So, the Victim complied with Luong's demands.

The situation escalated in the spring of 2018 when Luong imposed a debt of $180,000 to account for the Victim's purported mistakes with customers. Luong told the Victim that she would go to jail if she did not pay back the money. To enforce the debt, Luong forced the Victim to write and sign a contract. In addition, Luong became physically violent with the Victim. She admitted to beating, hitting, kicking, pinching, and biting the Victim. The Victim testified that Luong committed other acts of violence, including beating her with a broom, hitting and stabbing her with nail instruments, and pouring acetone over her head as punishment for poor work performance.[2]

Luong's conduct took a toll on the Victim. The Victim testified that she felt she "didn't have anywhere to go" because she did not have the money to repay Luong. J.A. at

---

[2] The Government introduced a video that showed Luong threatening to pour acetone on the Victim's head for her wrongdoings. S.A. 001–006 (transcript of video).

She lived in fear at work because Luong hit her "day by day." *Id.* at 257. At some point, she told Luong she no longer wanted to work at Luxury Nails. The Victim testified that Luong discouraged her from quitting because she owed too much money to the salon. The Victim continued to work at the salon because she was afraid Luong would tell Aunt Mai about her debts. Around May 2018, Luong forced the Victim to cash her paychecks and return the money to Luong to help satisfy the $180,000 debt. The Victim said she complied because she "got hit so many times [she] was so afraid." J.A. 252.

The night of June 24, 2018, Luong and her boyfriend drove to Aunt Mai's house and the Victim got into their car. The Victim testified they drove for two hours while Luong assaulted her. On June 26, the Victim's family observed bruising and injuries on her body, and the Victim finally confided in them about Luong's abuse. The family took the Victim to the police station where the police started an investigation and photographed the Victim's injuries. The photos depict the Victim with a swollen lip, bruised face, and black eyes. She also had bruising and abrasions on her thighs, arms, hands, and stomach, along with scarring on her back and chest. Immediately after she spoke with police, the Victim went to the hospital where a doctor treated her injuries and observed bruising around the Victim's eyes, face, and body. The doctor noted scars on the Victim's back, chest, and breast, along with some lash marks that appeared "to be scarred already." J.A. 118–20. The Victim testified that Luong inflicted her injures.

Law enforcement continued their investigation and executed a search warrant at Luxury Nails. Police spoke to Luong's mother and recovered the $180,000 debt contract, the notebook where the Victim wrote out her mistakes, and some of the nail tools that had

6

been used to injure the Victim. About a month after law enforcement executed their search, Luong assaulted her mother for cooperating with the police.

## B.

At the close of the Government's case, Luong moved for judgment of acquittal under Federal Rule of Civil Procedure 29, arguing the evidence was insufficient to support a conviction. The district court denied the motion and found that a reasonable jury could find beyond a reasonable doubt each element of the forced labor offense.

Luong presented a defense at trial and testified before the jury. She denied the Victim's accusations of physical abuse, to include the assault from June 2018, pouring acetone on her head, beating her with a broom, and striking her with nail tools. She also denied the Victim's claims of manipulation to enforce a $180,000 debt contract for poor work performance and threatening legal process for failing to repay it. She said that around spring 2018, she had developed concerns about the quality of the Victim's work. She told the Victim she wanted to ask Aunt Mai for help to get the Victim working properly, but she never used this as a threat to keep the Victim working at the salon. She also tried to justify her violent behavior by explaining that she was under pressure at work and lost control of her actions.

The jury convicted Luong. In April 2021, a government agent interviewed the Victim and observed scars on her back, arm, and chest. When asked where she got the injuries, the Victim said "Luong," accompanied with a "stabbing motion with her hand." S.A 009.

7

## C.

The Presentence Investigation Report (PSR) calculated Luong's base offense level at 22. It applied a host of enhancements that adjusted the final offense level to 37. Relevant here, it applied a four-level permanent scarring enhancement under U.S.S.G. § 2H4.1(b)(1)(A) and a two-level vulnerable victim enhancement under U.S.S.G. § 3A1.1(b)(1). Luong objected to the application of both enhancements. [*Id.* at 819–22.]

The district court held a sentencing hearing on June 15, 2022. It overruled Luong's objections to the PSR and applied the four-level § 2H4.1(b)(1)(A) permanent scarring enhancement. The district court "reasonably conclude[d]" that the scars were permanent based on the Government's statement that at the time it filed the sentencing memorandum, a year prior, the scars were still visible. J.A. 680–81. In addition, the court viewed photos of the scars and bruising at trial and reviewed the agent's report that the scars were still visible in April 2021, almost three years after the event occurred. The court also applied the two-level § 3A1.1(b)(1) vulnerable victim enhancement because the Victim's culture, which values family reputation, and her lack of knowledge about the American legal system, made her unusually vulnerable to Luong's threats. The court found her unusual vulnerability was visible from her testimony and videos that the court viewed. J.A. 690. The court also concluded that Luong believed she could get the Victim to do things through threats and coercion. The court adopted the findings of the PSR and sentenced Luong to 180 months' imprisonment. Luong appealed her conviction and sentence.

II.

A.

We begin with Luong's argument that the Government did not present sufficient evidence to allow a reasonable jury to convict her of forced labor. A jury verdict "*must be sustained* if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942), *overruled on other grounds by Bourjaily v. United States*, 483 U.S. 171 (1987)). In a criminal case, substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* Our review of the sufficiency of the evidence is to focus on the "complete picture that the evidence presents" viewed in "context and in the light most favorable to the Government." *Id.* at 863. When applying this standard of review, "[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." *Id.* at 862 (citation omitted).

B.

The Government charged Luong with one count of forced labor in violation of 18 U.S.C. § 1589. This statute penalizes any person who "knowingly provides or obtains the labor or services of a person by" one or more of the following "means":

> (1) . . . force, threats of force, physical restraint, or threats of physical restraint to that person . . . ; (2) . . . serious harm or threats of serious harm to that person . . . ; (3) . . . abuse or threatened abuse of law or legal process; or (4)

9

> . . . any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person . . . would suffer serious harm or physical restraint

18 U. S.C. § 1589(a). A person who obtains forced labor shall be punished by a fine or imprisonment up to twenty years or both. *Id.* § 1589(a), (d). The term "[s]erious harm," is defined as:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor services in order to avoid incurring that harm.

*Id.* § 1589(c)(2). The term "abuse or threatened abuse of law or legal process," means the "use or threatened abuse of a law or legal process . . . in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." *Id.* § 1589(c)(1).

To prove a violation of this statute, the government must first produce evidence from which a jury could find the defendant "knowingly provide[d] or obtain[ed] the labor or services" of the victim through one or more of the methods prohibited by § 1589. *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017). It must then prove that the threat of harm was "sufficiently serious to *compel* [the victim] to *remain*" in the condition of servitude when the victim otherwise would have left. *Id.* at 618 (citation omitted). The harm or threat of harm is "considered from the vantage point of a reasonable person in the place of the victim." *Id.* Last, the government must prove an "express *scienter* requirement." *Id.* (citation omitted). To satisfy this requirement, evidence must exist from which a jury could find "that the employer *intended* to cause the victim to believe that she

10

would suffer serious harm—from the vantage point of the victim—if she did not continue to work." *Muchira*, 850 F.3d at 618 (citation omitted). "The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her" if she left employment. *Id.* (citation omitted).

When analyzing whether the employer's conduct was sufficiently serious to coerce the victim to provide labor or services against her will, a court may consider the "particular vulnerabilities of a person in the victim's position." *Id.* at 618 (citation omitted). But the victim's "acquiescence [must also] be *objectively reasonable* under the circumstances." *Id.* (citation omitted).

## C.

In Luong's view, the evidence does not establish: (1) the express scienter requirement—that she intended for the Victim to believe that she would suffer serious harm if she did not continue working—or (2) that it was reasonable for the Victim to continue working under the circumstances. She thinks the evidence showed that she did not target the Victim. She required all employees to pay for mistakes on the job, and she physically released her stress on those closest to her, including her mother. Also, the Victim had the resources to escape. She had a driver's license, family support, and was a naturalized citizen, so she faced no threat of deportation if she left Luong's employment.

We disagree with Luong's piecemeal interpretation of the evidence. There is overwhelming evidence from which a reasonable juror could conclude the scienter requirement was satisfied, and that the Victim's acquiescence to Luong's coercion was

reasonable under the circumstances.  Threats of inflicting harm upon the victim (including threats of legal process such as arrest), exploiting a victim's lack of education and familiarity with the English language, and physical force are ways defendants instill fear in victims to force them to labor against their will.  *Muchira*, 850 F.3d at 618–19, 623 (collecting cases); *United States v. Callahan*, 801 F.3d 615, 620 (6th Cir. 2015) (defendants ordered developmentally-delayed victim to beat her minor daughter, filmed the beating, and threatened the victim they would call law enforcement and have her daughter taken away if she did not continue to comply with their demands).

Here, Luong knowingly engaged in those means to coerce the Victim into working against her will.  Ample witness testimony revealed that she inflicted brutal physical force against the Victim and that the Victim complied with Luong's demands out of fear of physical retribution.  Luong took advantage of the Victim's minimal education and unfamiliarity with English and the American legal system when she threatened that the Victim would go to jail if she failed to pay back a $180,000 debt for "mistakes" she made with customers.  When the Victim expressed a desire to quit her job, Luong discouraged her from doing so under the false premise that the Victim owed the salon too much money. Last, Luong exploited the Victim's cultural beliefs by threatening to tell Aunt Mai embarrassing things about the Victim—that she used Aunt Mai's name to borrow money from Luong and was making mistakes at work.  The Victim continued working because she had "nowhere to go."  J.A. 241–43.  Considering all the evidence, it was objectively reasonable that the Victim submitted to Luong's threats and coercion and continued working against her will.

12

Luong also attacks her conviction by presenting evidence that she denied many of the Victim's accusations of physical harm, along with the threats of reputational harm and legal process. But where the "evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." *Burgos*, 94 F.3d at 862. Here, the jury weighed the credibility of each witness and determined that the Victim's version of events was most credible. Determinations of credibility "are within the sole province of the jury" and are not "susceptible to judicial review." *Id.* at 863 (citation omitted). As such, we are in no position to disturb the jury's credibility determinations.

In sum, viewing the evidence as a whole and in a light most favorable to the Government, sufficient evidence exists from which a reasonable juror could find the elements of forced labor were met beyond a reasonable doubt. Moreover, there was substantial evidence Luong knowingly coerced the Victim into a perpetual state of servitude and that the Victim's acquiescence was reasonable under the circumstances. Accordingly, we sustain Luong's forced labor conviction under 18 U.S.C. § 1589.

## III.

### A.

Having resolved the issues regarding Luong's conviction, we address the challenges to her sentence. She argues that the district court erred when it applied a two-level vulnerable victim enhancement under U.S.S.G. § 3A1.1(b)(1) and a four-level permanent scarring enhancement under U.S.S.G. § 2H4.1(b)(1)(A). She contends that the evidence

13

does not support application of either enhancement and that the district court procedurally erred when it failed to state factual findings to support application of the enhancements.

We review criminal sentences for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). We must first "ensure that the district court committed no significant procedural error." *Id.* If the district court committed a "significant procedural error," we must vacate and remand for resentencing. *United States v. Carter*, 564 F.3d 325, 328–31 (4th Cir. 2009). We may consider the substantive reasonableness of the sentence only if we find the sentence procedurally reasonable. *Id.* (citation omitted). Procedural errors include "failing to calculate (or improperly calculating) the Guidelines range . . . selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* at 328. When rendering a sentence, the district court must place on the record an " 'individualized assessment' based on the particular facts of the case before it." *Id.* at 330. Such a making of the record is critical, because "[i]n reviewing this assessment, an appellate court may not guess at the district court's rationale, searching the record for statements by the [g]overnment or defense counsel or for any other clues that might explain a sentence." *Id.* at 329–30.

In assessing whether the district court properly calculated the Guidelines range, we review the court's factual findings for clear error and its legal conclusions de novo. *United States v. Hampton*, 628 F.3d 654, 659 (4th Cir. 2010). "A finding is 'clearly erroneous' when although there is evidence to support it," we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Dugger*, 485 F.3d 236, 239 (4th Cir. 2007) (citation omitted). However, if the district court fails to explain its

14

rationale, then the clearly erroneous standard does not guide our review on appeal. *United States v. Wilkinson*, 590 F.3d 259, 269–70 (4th Cir. 2010) (concluding that the district court's failure to explain its reasoning made the court's finding "incapable of meaningful appellate review").

### B.

We first consider whether the district court erred when it applied a two-level vulnerable victim enhancement under § 3A1.1(b)(1). The Guidelines allow for a two-level enhancement to a defendant's offense level if the defendant "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). This court uses a two-step inquiry to determine whether the vulnerable victim enhancement was properly applied. *United States v. Etoty*, 679 F.3d 292, 294 (4th Cir. 2012).[3]

"First, a sentencing court must determine that a victim was unusually vulnerable." *Etoty*, 679 F.3d at 294 (quoting *United States v. Llamas*, 599 F.3d 381, 388 (4th Cir. 2010)). "In other words, because of age, mental or physical condition, or any other relevant deficit, in a proper § 3A1.1 enhancement the victim must be more susceptible to abuse from a perpetrator than most other potential victims of the particular offense." *Id.* For example, victims of a tornado relief mail fraud scheme could not be vulnerable victims under § 3A1.1 solely based on the fact they lived in a city that recently suffered a tornado. *United*

---

[3] Luong argues that there is also a third requirement that the sentencing court find that the defendant targeted the victim because of their unusual vulnerability. "But this 'targeting' requirement is no longer the law. 'In 1995, the Sentencing Commission adopted Amendment 521, rendering it unnecessary for a sentencing court to find that a defendant had specifically targeted his victim.'" *Etoty*, 679 F.3d at 294 (quoting *United States v. Bolden*, 325 F.3d 471, 501 n.35 (4th Cir. 2003)).

*States v. Wilson*, 913 F.2d 136, 138 (4th Cir. 1990); *see also* U.S.S.G. § 3A1.1 cmt. n. 2 (explaining that a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank).

"Second, the court must then assess whether the defendant knew or should have known of such unusual vulnerability." *Etoty*, 679 F.3d at 294 (quoting *Llamas*, 599 F.3d at 388). "It is quite clear that '[u]nder the plain meaning of § 3A1.1, no more is required' than the actual vulnerability of the victim and the defendant's knowledge of that vulnerability to support application of the enhancement." *Id.* (quoting *United States v. Lynn*, 636 F.3d 1127, 1139 (9th Cir.2011)).

Luong says the district court procedurally erred when it failed to state adequate findings to support application of the two-level vulnerable victim enhancement under § 3A1.1(b)(1). At sentencing, Luong objected to application of the enhancement. She argued that the Victim was not a vulnerable victim because the Victim exhibited none of the typical factors that would render her "abnormally susceptible" to threats. Rather, the Victim had resources, lived with family, and received a professional certification. She was a sophisticated party as the former owner-operator of a nail salon. The Government responded that the Victim had characteristics that made her a vulnerable victim. For example, she was a Vietnamese immigrant who received a fourth or fifth grade education, she did not complete school in the United States and was unfamiliar with English, she had no knowledge of the American legal system, and her culture valued reputational harm.

The court overruled Luong's objection. It concluded that the Victim had distinguishing characteristics that made her unusually vulnerable. First, the Victim held a

16

cultural belief that valued reputation within the family.  Thus, Luong's threats to tell Aunt Mai embarrassing things about the Victim were meaningful.  Second, the Victim's lack of knowledge about the American legal system made her susceptible to Luong's threats.  The court noted, "[m]ost people know that you can't go to jail for refusing to pay a debt."  J.A. 689.  Last, the court said, "if you just watch the videos and watch her testify, she was vulnerable."  *Id.* at 690.  Based on these findings, the court applied the two-level vulnerable victim enhancement under § 3A1.1(b)(1).  We agree with Luong that the district court procedurally erred because its findings are insufficient to support application of the § 3A1.1(b)(1) enhancement.

We may look to the justifications offered in the PSR to sustain the district court's sentencing decision only where the district court's findings are explicit and complete. *United States v. Molen*, 9 F.3d 1084, 1086–87 (4th Cir. 1993).  Membership in a susceptible class, "without more, does not justify application of the vulnerable victim enhancement." *United States v. Blake*, 81 F.3d 498, 504 (4th Cir. 1996) (citing *United States v. Lee*, 973 F.2d 832, 834 (10th Cir. 1992) ("Without more, class membership cannot support a two point enhancement under section 3A1.1")); *see also United States v. McCall*, 174 F.3d 47, 50 (1st Cir. 1998) (explaining that courts limit application of § 3A1.1 to "broad generalizations about victims based upon their membership in a class . . . where a very substantial portion of the class is not in fact particularly vulnerable to the crime in question).

Because the district court only discussed Vietnamese culture generally and did not find any particularized facts about the impact of that culture on the Victim, the court's first

17

characteristic resembles a broad assumption about the Victim's vulnerability based upon her membership in a class. For that reason, it cannot support a finding of unusual vulnerability. *See Blake*, 81 F.3d at 504. The second and third characteristics fare no better under our review. In its brief discussion of the second characteristic, the district court acknowledged that "a lot of people don't know anything about the legal system" and "probably most people know that you can't go to jail for refusing to pay a debt." J.A. 689. These observations are not clear enough to satisfy § 3A1.1's requirements. *See Molen*, 9 F.3d at 1086–87. In a similar vein, the court's third finding regarding the Victim's appearance and testimony does not explain why it led the court to believe she was vulnerable. In sum, the court's conclusion is not supported by findings that set forth the particularized characteristics that made the Victim more susceptible to Luong's threats and coercion than "most other potential victims of the particular offense." *United States v. Singh*, 54 F.3d 1182, 1191 (4th Cir. 1995).

Given this context, the PSR cannot sustain the sentence because the district court needed to clearly and unequivocally identify which particularized characteristics made the Victim *unusually vulnerable* and why. We are precluded from "guess[ing] at the district court's rationale, searching the record for statements by the [g]overnment or defense counsel or for any other clues that might explain a sentence." *Carter*, 564 F.3d at 329–30. When, as here, the district court has procedurally erred, our review of the court's application of the enhancement is limited. *Wilkinson*, 590 F.3d at 269–70. Because of this limitation, we decline to reach Luong's substantive challenges to her sentence on the application of the vulnerable victim enhancement under § 3A1.1(b)(1). We therefore

18

vacate the sentence and remand for the district court to clarify the combination of factors that made the Victim particularly vulnerable.

C.

We next consider Luong's contention that the district court erred when it applied a four-level enhancement pursuant to U.S.S.G. § 2H4.1(b)(1)(A) for permanent scarring. The Guidelines define a permanent or life-threatening injury as an "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely permanent; or an obvious disfigurement that is likely to be permanent." U.S.S.G. § 1B1.1 cmt. n.1(K). Permanent scarring has been held sufficient to support application of the enhancement under § 2H4.1(b)(1)(A). *See e.g.*, *United States v. Taylor*, 337 F. App'x. 342, 344 (4th Cir. 2009) (No. 08-5083) (citing *United States v. Miner*, 345 F.3d 1004, 1006 (8th Cir. 2003)); *United States v. Phillips*, 239 F.3d 829, 848 (7th Cir. 2001); *United States v. Price*, 149 F.3d 352, 354 (5th Cir. 1998).

Luong argues that the district court did not identify or consider sufficient evidence that establishes the scars were permanent, such as physician or expert testimony. Rather, it relied on the Government's proffer that the scars were still visible. At sentencing, the district court posited, "from what evidence it could determine the scars were permanent." J.A. 680. The court explained it had already reviewed the agent's report from April 2021 that said the agent viewed scars on the Victim's back, arm, and chest. The court also viewed evidence of "scarring and bruising" from trial. J.A. 680. Then, the Government

19

proffered that the "agent viewed [the scars] . . . [and] at the time the sentencing memorandum [was filed], [the scars] were still there." *Id.* at 680–81.[4]

The district court noted that the sentencing memorandum may have been filed a year before sentencing, but even so, that was still three years after the incident. *Id*. The court then, "reasonably conclude[d]" that if the scarring it observed during trial was still there years later, it was permanent as contemplated by the Guidelines. J.A. 681. Therefore, the injury the Victim sustained, and the permanent nature of her scarring were sufficient to uphold the four-level § 2H4.1(b)(1)(A) enhancement. *Id.*

We discern no error in the district court's finding. First, the court adequately explained its conclusion that the scars were permanent based on the agent's April 2021 report, photos from trial, and the Government's proffer that the scars were still visible three years after the injuries were inflicted. Second, such evidence is sufficient to show the Victim sustained scarring that is considered "permanent . . . bodily injury" as contemplated by § 2H4.1(b)(1)(A). *See Price*, 149 F.3d at 354 (the application note to § 1B1.1 encompasses "injuries that may not be terribly severe but are permanent"); *Phillips*, 239 at 848 (affirming application of the § 2H4.1(b)(1)(A) enhancement where victim suffered permanent and disfiguring scars on her face). As we are not "left with the definite and firm conviction that a mistake has been committed," will not disturb the district court's finding and decision to apply the four-level § 2H4.1(b)(1)(A) permanent scarring enhancement. *Dugger*, 485 F.3d at 239.

---

[4] Luong's counsel did not object to the Government's proffer that the scars were still visible.

IV.

For the reasons stated, we affirm Luong's conviction, vacate her sentence, and

remand for resentencing consistent with this opinion.

*AFFIRMED IN PART, VACATED*
*AND REMANDED WITH INSTRUCTIONS*